IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-154

No. 378A20

Filed 17 December 2021

IN THE MATTER OF: N.B.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 5 May 2020 by Judge Hal Harrison in District Court, Madison County. This matter was calendared in the Supreme Court on 12 November 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Law Offices of Jamie A. Stokes, PLLC, by Jamie A. Stokes, for petitioner-appellee Madison County Department of Social Services.*

*Sophie Goodman for appellee Guardian ad Litem.*

*Peter Wood for respondent-appellant mother.*

EARLS, Justice.

Respondent, the mother of the juvenile N.B. (Nancy),[1] appeals from the trial court's order terminating her parental rights. She argues that the trial court abused its discretion by concluding that termination was in Nancy's best interests. In particular, respondent points to evidence in the record that she had a bond with her child and challenges the trial court's findings to the contrary. However, the trial

---

[1] A pseudonym is used in this opinion to protect the juvenile's identity and for ease of reading.

court's findings were supported by the evidence. Further, in making its determination that termination of respondent's parental rights was in Nancy's best interests, the trial court considered the applicable statutory criteria and made written findings concerning the relevant factors. The court's ultimate decision is supported by reason and not an abuse of discretion. As a result, we affirm the trial court's order.

## I.  Background

¶ 2        On 17 June 2019, Madison County Department of Social Services (DSS) filed a petition alleging that Nancy, who was seven years old at the time, was a neglected juvenile. DSS alleged it had received four reports between February and June 2019, three of which followed Nancy's disclosure to educators that she felt unsafe in her home due to abuse by respondent's boyfriend and respondent's substance abuse and self-harm. Nancy also disclosed that she had thought about suicide and had a plan for accomplishing it. DSS discovered that one of respondent's boyfriends, Todd, had an extensive criminal history, and DSS established a safety plan with respondent to prevent Todd from having contact with Nancy. Respondent violated this safety plan numerous times and continued to have contact with Todd, even though he had stated he wanted to "kill children," and respondent believed he was a danger to Nancy. Nancy further disclosed that respondent had instructed her to lie to DSS. DSS obtained nonsecure custody of Nancy the same day the petition was filed and placed her in foster care.

¶ 3    On 1 July 2019, DSS filed an amended petition alleging that Nancy was a neglected and dependent juvenile. The amended petition detailed respondent's extensive history with DSS, beginning when Nancy's half-siblings were removed from respondent's care in February 2009 due to domestic violence and substance abuse. DSS became involved with Nancy at her birth in April 2012 after she tested positive for marijuana and respondent tested positive for benzodiazepines. In addition, the petition alleged respondent had been arrested and charged with multiple drug offenses on 15 June 2019. She submitted to a drug screen, which was positive for oxycodone and opiates, and she admitted to methamphetamine use several days prior. DSS obtained a hair follicle test for Nancy, which revealed dangerously high levels of methamphetamine and amphetamines. The petition also alleged that Nancy's father was deceased, that respondent lacked the ability to care for Nancy on her own, and that respondent had no appropriate alternative childcare arrangement.

¶ 4    Following a hearing on 1 July 2019, the trial court adjudicated Nancy to be a neglected and dependent juvenile. As an interim disposition, the court required respondent to produce two consecutive negative drug screens before exercising visitation with Nancy.

¶ 5    The trial court held a combined disposition and permanency-planning hearing on 12 August 2019. In its resulting order, the court found that seventeen reports were made to DSS since Nancy's birth and that Nancy had "been surrounded by domestic

violence, drug use, and instability her whole life." Respondent admitted to having methamphetamine in her possession when DSS took custody of Nancy, and Nancy's hair follicle test was positive for methamphetamine in her system. Respondent acknowledged she had previously witnessed Nancy hallucinating. The court further found that respondent had started attending substance abuse classes, though the court also noted that this was the third time she had done so. Respondent had not visited with Nancy since the adjudication as she failed to produce two negative drug screens; she instead tested positive three times.

¶ 6     The trial court found that aggravated circumstances existed pursuant to N.C.G.S. § 7B-901(c)(1)(b) and (e) (2019) and relieved DSS from making efforts toward reunification. The court determined a permanent plan of adoption with a concurrent plan of guardianship was in Nancy's best interests. As a necessary precondition of visitation, respondent was required to produce negative drug screens for six consecutive weeks; if she complied with this precondition, respondent would be permitted visitation, provided visitation was also recommended by Nancy's therapist. Respondent did not appeal the adjudication and disposition orders.

¶ 7     By the December 2019 permanency-planning hearing, respondent had made some progress on her case plan. She produced six negative drug screens. Based on this progress, she requested visitation with Nancy. However, Nancy's therapist recommended against allowing visitation, and the trial court refused respondent's

request. The trial court maintained Nancy's permanent plan as "adoption concurrent with guardianship."

¶ 8        On 2 December 2019, DSS filed a petition to terminate respondent's parental rights on the grounds of abuse, neglect, and dependency. *See* N.C.G.S. § 7B-1111(a)(1)–(2) (2019). Following a hearing, the court entered an order on 5 May 2020 that found the grounds as alleged in the petition and determined it to be in Nancy's best interests to terminate respondent's parental rights. Respondent appeals.

## II.    Best-interests determination

¶ 9        The termination of parental rights proceeds in two stages. First, the trial court adjudicates the existence of any alleged grounds for termination under N.C.G.S. § 7B-1111 (2019). *See* N.C.G.S. § 7B-1109 (2019). The petitioner must prove by clear and convincing evidence that one or more grounds for termination exist. *In re A.U.D.*, 373 N.C. 3, 5–6 (2019). If the trial court determines that at least one ground has been established, the case proceeds to the dispositional stage, where the court "determine[s] whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2019).

¶ 10       Here, the trial court adjudicated grounds to terminate respondent's parental rights on the basis of abuse and neglect under N.C.G.S. § 7B-1111(a)(1) and dependency under N.C.G.S. § 7B-1111(a)(6). Respondent concedes that the trial court "properly found grounds to terminate [her] parental rights." Accordingly, our review

of the termination order is limited to determining whether the trial court properly concluded that termination of respondent's parental rights was in Nancy's best interests.

¶ 11        Under N.C.G.S. § 7B-1110, when the trial court determines whether termination of parental rights is in a juvenile's best interests, the court

> shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019). The court's dispositional findings are binding on appeal if supported by the record evidence. *In re K.N.K.*, 374 N.C. 50, 57 (2020). By statute, "[t]he court may consider any evidence, including hearsay evidence as defined in [N.C.]G.S. 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile." N.C.G.S. § 7B-1110(a). The trial court's ultimate determination regarding the child's best interests is reviewed for

abuse of discretion and will be reversed only if it is "manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107 (2015).

**A. Challenges to the trial court's findings of fact**

¶ 12        Respondent first challenges dispositional findings of fact 44 and 45, which state:

> 44. The minor child does not have a strong bond with the respondent mother. They have not visited since June of 2019 due to prior orders requiring the respondent mother to provide clean drug screens and due to the recommendations of Dr. Huneycutt. At this time, future interaction between the juvenile and the respondent mother could trigger the juvenile, and the juvenile would require significant safety and stability measures before any such contact should occur.

> 45. While the juvenile has asked when she will see the respondent mother, she has not requested to see the respondent mother and most of her inquiries regarding the respondent mother indicate that she has established a parentified role with the respondent mother. The minor child primarily inquires about her animals when asking about the respondent mother.

The record contains ample evidence supporting both findings. Nancy began therapeutic services in August 2019, and her psychologist, Dr. Dominique Huneycutt, noted that she presented with a history of "significant emotional and behavioral difficulties," including diagnoses of post-traumatic stress disorder, oppositional defiant disorder, and attention deficit hyperactivity disorder. Nancy had previously

engaged in self-harming behavior, exhibited physical and verbal aggression, and acknowledged prior suicidal ideation and planning.

¶ 13　　Respondent attended visitations with Nancy for a short period of time after Nancy was removed from respondent's care in June 2019, but respondent was denied visitation following the initial adjudication hearing due to her inability to produce two consecutive negative drug screens. Nancy's behavior worsened during the time respondent had visitations with her. Nancy was reportedly "on edge" on the days when she would visit with respondent, to the point that she pulled her hair out. She also exhibited behavioral problems in her foster home, including excessive cursing, hitting, screaming, biting, and defiance, for approximately two days following a visit. Nancy also assumed a parental role towards respondent, attempting to moderate her disclosures to DSS in order to protect respondent and requesting DSS to check on respondent because she "needed to make sure [respondent] was okay." However, Nancy never indicated to her social worker a desire to see respondent. Dr. Huneycutt recommended visitation with respondent not resume until Nancy was able to safely process her trauma.

¶ 14　　At the termination hearing, Dr. Huneycutt reiterated that Nancy was "a seriously, emotionally disturbed child, [with] severe behaviors and safety risks," and "any additional environment[al] chaos or substance exposure and damage would further set her back and exacerbate conditions." Dr. Huneycutt advised the court that

Nancy would need extensive support and stability, including intensive therapeutic supports; future evaluations; high levels of consistency, structure, safety, and responsiveness; intensive safety precautions; possible medical-neurological interventions; structured activities; peer skills; social interaction skills; safety skills; very high level of services with skilled professionals; and "a very stable environment for a very long time." Dr. Huneycutt acknowledged Nancy did occasionally say she missed respondent and that she wanted to go back to her mother, but as she further explained:

> [m]ost commonly [Nancy's] statements will—she asks about her animals, and she makes statements like, "I need to see my mother." And when you explore it, she's worried about her mother. She's worried about whether she's okay. . . . And she doesn't bring her mother up a lot. She brings up her biological father. She brings up [respondent's boyfriends]. She talks about her animals. But she's, "I'm the warrior. I killed the bear. I need to be with my mother." And she's describing protective roles. Her play reflects protective roles. So she does—and yes, she talks about her mom.

Thus, evidence in the record showed that Nancy had not had any contact with respondent since June 2019, that Nancy had not asked the social worker to see respondent, that Nancy would have to work through her past trauma before she could resume visits with respondent, and that Nancy discussed her feelings towards respondent during therapy in a protective or parental role and in the context of her animals. Based on this evidence, the trial court reasonably determined that Nancy

and respondent did not have a strong or healthy bond. *See In re D.L.W.*, 368 N.C. 835, 843 (2016) (stating that it is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn therefrom). Findings of fact 44 and 45 are supported by relevant and reliable evidence.

**B. Challenges to the trial court's best-interests determination**

¶ 15      Respondent also challenges findings of fact 46 and 48, which state:

> 46. Given the juvenile's diagnoses and Dr. Huneycutt's opinion that she is a seriously emotionally disturbed child, the juvenile is in high need of stability and permanence and it is not in the best interest of the juvenile to further postpone her permanence.
>
> . . . .
>
> 48. In light of the findings above, it is in the best interest of the juvenile [Nancy] that the [c]ourt terminate the parental rights of the respondent mother . . . to said juvenile.

These findings are not factual in nature but instead address the ultimate question of Nancy's best interests. We thus consider respondent's challenges to them as such. *See In re A.S.T.*, 375 N.C. 547, 555 (2020) ("Although the trial court labeled these conclusions of law as findings of fact, findings of fact which are essentially conclusions of law will be treated as such on appeal." (cleaned up)). Respondent relatedly challenges the trial court's conclusion of law 7, which also reflects its ultimate determination that termination of respondent's parental rights was in Nancy's best

interests.

### 1. *The trial court's consideration of respondent's bond with Nancy*

¶ 16     Respondent first argues that the trial court abused its discretion because the court failed to consider her tenuous bond with Nancy in the proper context. She argues that her lack of opportunity to visit with Nancy, which she attributes to the trial court having "fast tracked the case, moving full speed ahead from the initial underlying petition to termination in eight months," prevented the court from having the time needed to adequately assess their relationship. Respondent asserts that "[n]ot enough time had passed to evaluate whether the trial court should have terminated parental rights," and that with additional time she would have been able to meet the necessary criteria to resume her visits with Nancy and strengthen the bond between them.

¶ 17     Initially, we note that the trial court acted in accordance with the Juvenile Code throughout this case. The "fast track[ing]" that respondent refers to occurred because the trial court determined in its initial disposition and permanency-planning order that the case fit within the aggravated circumstances of N.C.G.S. § 7B-901(c)(1)(b) and (c)(1)(e). Based on this determination, the court relieved DSS from making any further efforts toward reunification, as permitted by that statute. The order specifically found that respondent "has committed, encouraged, and allowed the continuation of chronic physical or emotional abuse of the juvenile, and chronic and

toxic exposure to controlled substances that causes the impairment of the juvenile." Respondent did not appeal the trial court's order, and she is therefore bound by its findings and conclusions. *See In re A.S.M.R.*, 375 N.C. 539, 544 (2020).

¶ 18        Respondent argues that this case is analogous to various other termination cases, all of which addressed whether there were grounds for termination in the first place and not whether termination was in the child's best interest. She relies on *In re Young*, 346 N.C. 244, 252 (1997), in which this Court held that there was insufficient evidence that the parent willfully abandoned her child when she was prevented from seeing the child; *In re Shermer*, 156 N.C. App. 281, 288 (2003), in which the Court of Appeals held that the parent was not given adequate time to make progress on the conditions which led to his child's removal after the parent was released from prison; *In re N.D.A.*, 373 N.C. 71, 78–79 (2019), in which this Court vacated and remanded a termination order in part because the trial court's findings failed to resolve whether the parent's actions and omissions which constituted abandonment of his child were willful; and *In re I.R.L.*, 263 N.C. App. 481, 483 (2019), in which the Court of Appeals vacated and remanded a termination order with insufficient findings regarding willfulness when the parent was subject to a domestic violence protective order that forbid contact with the child's mother.

¶ 19        These cases turned on the question of whether there were sufficient evidence and findings of fact with respect to parental fault to justify the trial court's conclusion

that grounds existed to terminate a parent's parental rights. Here, respondent does not dispute that the trial court properly adjudicated multiple grounds for termination. None of the precedents respondent invokes stand for the proposition that, having concluded that grounds exist which permit termination of parental rights, the trial court must nevertheless delay its best-interests determination.

¶ 20     The focus at the dispositional stage of a termination hearing is whether termination is in the best interests of the child. *See* N.C.G.S. § 7B-1110(a).

> [A]lthough parents have a constitutionally protected interest in the care and custody of their children and should not be unnecessarily or inappropriately separated from their children, "the best interests of the juvenile are of paramount consideration by the court and . . . when it is not in the juvenile's best interest to be returned home, the juvenile will be placed in a safe, permanent home within a reasonable amount of time." N.C.G.S. § 7B-100(5).

*In re A.U.D.*, 373 N.C. 3, 11–12 (2019).

¶ 21     Respondent does not cite any evidence in the record suggesting Nancy's best interests would have been served by delaying the termination hearing. Dr. Hunneycutt testified that, at the time the termination hearing occurred, any interaction with respondent "could be triggering for [Nancy]," and that before respondent's visitation with Nancy could resume "a lot of things . . . would have to happen." Among the many things that "would have to happen," Nancy "would need to be in a stable placement, need to be stable at school, and we would at least need to have fairly good safety for her in order to not overwhelm her." There was no evidence

presented by respondent or by any other party regarding how long it might take before respondent and Nancy made sufficient progress such that visitation could resume or regarding how long it might further take to allow respondent sufficient visitation to improve her bond with Nancy.

¶ 22     We also note that respondent's proposed delay relates to only one of the best interests factors: the parent-child bond. Even if respondent's bond with Nancy was strong and positive, "the bond between parent and child is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and the trial court is permitted to give greater weight to other factors." *In re Z.L.W.*, 372 N.C. 432, 437 (2019).

¶ 23     Ultimately, the trial court was presented with relevant and reliable evidence regarding the bond between respondent and Nancy as it existed at the time of the termination hearing, and it properly made findings based on that evidence. Of course, the trial court possessed the discretion to conclude, based upon its assessment of the relevant dispositional factors, that it was in Nancy's best interests not to terminate respondent's parental rights even after concluding that multiple grounds for termination existed. But respondent's argument that as a matter of law she was entitled to a delay in order to potentially improve her bond with Nancy is not supported by case law, by the evidence presented at the termination hearing, or by the Juvenile Code. The trial court did not err by moving forward with its best-interests determination after it concluded that grounds existed to terminate

respondent's rights.

### 2. *The trial court's weighing of the dispositional factors*

The trial court's order reflects that it considered all the required statutory criteria when it decided that termination of respondent's parental rights would be in Nancy's best interests. In addition to the findings already discussed, the court made uncontested findings that termination of respondent's parental rights would assist "in achieving permanency for [Nancy] and would eliminate [the] barrier to implementing" the permanent plan of adoption, which also supports the finding that Nancy was "in high need of stability and permanence." The court also found that Nancy was in a pre-adoptive placement and had a good relationship with her foster family. As in similar cases upheld by this Court, "the trial court's findings in this case show that it considered the dispositional factors in N.C.G.S. § 7B-1110(a) and performed a reasoned analysis weighing those factors." *In re Z.A.M.*, 374 N.C. 88, 101 (2020). We thus have no basis to reweigh these factors. *See In re A.U.D.*, 373 N.C. at 12 ("[T]his Court lacks the authority to reweigh the evidence that was before the trial court.").

### 3. *The trial court's failure to consider other dispositional alternatives*

Lastly, respondent argues that "the trial court abused [its] discretion by not recognizing that continued visitation was still in the best interests of Nancy." Respondent contends the court should have considered other dispositional

alternatives instead of termination to provide an avenue by which Nancy could maintain a relationship with her mother.

We have previously observed that

> this Court has rejected arguments that the trial court commits error at the dispositional stage of a termination of parental rights proceeding by failing to explicitly consider non-termination-related dispositional alternatives, such as awarding custody of or guardianship over the child to the foster family, by reiterating that "the paramount consideration must always be the best interests of the child."

*In re N.K.*, 375 N.C. 805, 820 (2020) (quoting *In re J.J.B.*, 374 N.C. 787, 795 (2020)). Here, there was no evidence presented at the dispositional hearing that an alternative disposition was available or preferrable to the termination of respondent's parental rights, and the evidence that was presented did not establish that Nancy's best interests would be served by maintaining a relationship with respondent. Instead, as stated above, the evidence indicated that contact with respondent impeded Nancy's progress and resulted in increased negative behaviors. The trial court found that Nancy will require "intense intervention," including "high levels of consistency; structure and safety; . . . a stable environment; and a high level of care for a very long time," which was best accommodated through the termination of respondent's parental rights. This determination was neither manifestly unsupported by reason nor so arbitrary that it could not have been the result of a reasoned decision.

### III.    Conclusion

The trial court did not abuse its discretion in concluding that termination of respondent's parental rights was in Nancy's best interests. Accordingly, we affirm the trial court's order terminating respondent's parental rights.

AFFIRMED.